TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,

v.

Joseph T. THORNTON, Appellee.

No. 17906.

Court of Civil Appeals of Texas, Fort Worth.

Sept. 22, 1977.

Rehearing Denied Oct. 20, 1977.

---

**394**

Cantey, Hanger, Gooch, Munn & Collins and Stephen A. Madsen, Fort Worth, for appellant.

Herrick & Waltrip and Bill Waltrip, Fort Worth, for appellee.

## OPINION

SPURLOCK, Justice.

This is a workmen's compensation case. The jury found that plaintiff was totally and permanently disabled as a result of an accident. The insurance carrier asserts there was no evidence or the evidence was factually insufficient to support the jury's finding that the duration of plaintiff's incapacity is permanent. By way of cross point, plaintiff moves this court to assess an additional ten percent damages against the insurance carrier for a frivolous, delay-only appeal pursuant to Rules 435 and 438, Tex. R.Civ.P.

We affirm and add ten percent damages pursuant to Rules 435 and 438 of the Tex.R. Civ.P.

The only issue raised by the insurance carrier in this case concerns the permanency of Thornton's disability; specifically, the insurance carrier contends that there was "no evidence" or "insufficient evidence" to support the jury's finding that Thornton's total incapacity was permanent. The rules by which this court must be bound in reviewing these points of error are set forth in Judge Calvert's article, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1960). See also *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). On appeal, the insurance carrier has not assigned as error the jury's finding that the injury sustained by Thornton was a producing cause of the total incapacity.

The trial court defined "Injury" and "Producing Cause" as follows:

"INJURY" means damage or harm to the physical structure of the body and such diseases or infection as naturally result therefrom, or the *incitement, acceleration, or aggravation* of any disease, infirmity, *or condition, previously* or subsequently *existing*, by reason of such damage or harm. (Emphasis added.)

"PRODUCING CAUSE" means an injury or condition which, either independently or *together with one or more other* injuries or *conditions results in incapacity*, and without which such incapacity would not have occurred *when it did.* (Emphasis added.)

The court has carefully reviewed the entire record and will not attempt to mention all aspects of the testimony. The following is a fair summary of the testimony.

Prior to his injury, Thornton was a very athletic young man. While in high school, he played varsity football for four years, played basketball for one year and ran track. Also while in high school, he had numerous jobs hauling hay for neighbors. He described his hauling hay as following a truck through a field, reaching down and picking up a bale of hay and throwing it onto a flatbed truck. This was done all day long. The bales each weighed in excess of one hundred pounds. While participating in all of these activities, he never had any problems with his back.

Upon graduation from high school, Thornton caused his name to be placed on the waiting list for apprentice pipefitter's training. While so waiting, he got a job in the laboratory at Harris Hospital. He had started working for a plumbing company before he was accepted into the apprentice pipefitter's program through the union. He had had his name on the waiting list for the apprentice program for approximately one year before being accepted. At the trial, he explained that an apprentice is someone who has never had any experience in the field. The starting wage scale of an apprentice is fifty percent of a journeyman's wage. After the successful completion of five years of on-the-job and classroom training, the apprentice becomes a journeyman pipefitter.

Thornton started to work as an apprentice pipefitter in 1972 and worked in that capacity until his on-the-job injury in 1974. Up to the time of this injury, he had been able to perform all of the duties required of him in his job, which included the carrying of heavy pipes, stooping, crawling, climbing and bending.

On Friday, January 24, 1974, Thornton was in the process of unloading some cast iron water main fittings while in the course and scope of his employment with General Engineering Company. He felt a sharp pain in the lower portion of his back.

After resting for the weekend, he tried to work on Monday and Tuesday, but he was unable to do his usual work. On Wednesday, he went to see Dr. Bussey, an orthopedist, who examined him, took X-rays, gave him some medication, and advised him to take a week off from work and to see him again in a week, which he did.

After one week off, he returned to work for General Engineering Company. He testified that upon returning to work, he "didn't do hardly anything." He told them that he needed a light duty job, such as a copper job, since his back was hurt. He was told that no such work was available at that time. Instead, he was told to do just what he could. He stayed on the job for four or five weeks, but he was unable to do the same heavy work that he had done before he was injured. He was fired by General Engineering Company when he refused (because of his injured back) to help a laborer carry a heavy, five-foot oxygen bottle up to the second floor of the construction project. He was unemployed for one or two months. His union found employment for him with Broyles and Broyles Construction Company in Denton, Texas, working with copper; however, this job only lasted one day, since he "couldn't handle copper," because his back was bothering him.

At the time of trial, Thornton was employed in the hematology department at John Peter Smith Hospital in Fort Worth. In this job, one of his duties is to collect blood from patients. He testified that his back will hurt when he bends over a patient's bed two or three times in a row, while waiting for blood tubes to fill. When he straightens his back, he will sometimes hear it pop. In addition, his back hurts when he sits too long, stands too long, or tries to jog.

He was attending T.C.U.'s nursing school at the time of trial.

Dr. J. B. Harmon, an orthopedic surgeon, saw plaintiff on March 26, 1974; the history plaintiff gave him is a brief summary of plaintiff's testimony described above. Upon examination he found an indentation in plaintiff's back at the level of L–5. His condition was diagnosed as spondylolisthesis grade 1 of L–5 on S–1. The skeletal defect was probably a developmental condition. He testified that "[m]any people have worked all their lives and never known that they had it until some incident brought it to their attention and X-rays revealed this defect." A person with this defect is most susceptible to injury when lifting, bending, stooping and putting a person's body in awkward positions. He testified that the accident caused his incapacity; that it aggravated his previous condition and that the condition is permanent.

Winston Crabb testified that he was a journeyman pipefitter and that plaintiff was working under him at the time of the accident. They were installing a 48,000 pound boiler by themselves. Prior to the accident, plaintiff appeared to be physically fit and was doing this heavy work without difficulty or any complaints of pain or signs of disability. When the accident happened, the witness actually heard his back pop from a distance of eight feet and he saw Thornton drop to his knees. Plaintiff came back to work and tried to work because he had responsibilities and had to make a living, but he was unable to do his usual tasks.

The insurance carrier introduced the testimony of Dr. Thomas B. Bussey, and Dr. Robert T. Miller, both of whom are orthopedic surgeons. Dr. Bussey saw plaintiff on January 30, 1974, and the history plaintiff gave is a brief summary of plaintiff's testimony described above. He gave the same diagnosis as Dr. Harmon. He testified that he has seen patients with the same defects who are not having any pain and he does not recommend treatment for such persons "because I see a lot of people that may be sixty years old and for some reason I need to X-ray them and do X-ray them and find

this thing and they are not having any problems and I just, my philosophy is leave a sleeping dog lie, there's no use starting and getting in trouble." His examination revealed that plaintiff has a straightening of the lumbar spine, he is able to raise his left leg only to 30 degrees, and his disability is permanent. On cross examination, he testified there is a school of thought that spondylolisthesis can be caused by trauma. The condition can exist without any disability or symptom but can be triggered and become disabling by trauma, such as unloading or pulling on cast iron water mains. He testified that the accident here involved may have caused his slippage and that his condition is permanent. He testified that he would advise such a young man (such as plaintiff) to "go to college and get him a good education so he wouldn't have to do manual labor."

Dr. Miller testified that he examined the plaintiff for the defendant on February 10, 1974. On examination he found plaintiff was suffering pain on bending and the calf of his left leg was smaller than that of his right. The other orthopedic tests, excluding the X-rays, were negative. Upon examination of the X-rays, his diagnosis was the same as the other doctors. Plaintiff could not be a pipefitter. He also testified the ligaments were damaged by the accident and that "a ligament popping in two" could have been heard by a person standing five or six feet from plaintiff. He testified that spondylolisthesis can be aggravated and that the condition the plaintiff has is permanent in nature. Dr. Miller testified: "When a person has this bone defect that person has a weak link in his back. You can look at it just like you look at a chain. If you've got one link in that chain that's a little bitty weak wire instead of a great big heavy strong piece and you put a tremendous pull on it, that weak link is going to give way, something will give way in that part of the body." Plaintiff's condition was aggravated by the accident and also he suffered torn or other damage to the ligaments in the area of the defect in his spine. He will continue having additional injuries to this area of his back if he does manual

labor. He should be restricted from doing heavy manual labor. This condition is permanent.

■ There is ample evidence of probative nature to support the jury's verdict. The "no evidence" point is overruled.

The case of *State Highway Dept. of Texas v. Maris,* 532 S.W.2d 690 (Tex.Civ.App.—Texarkana 1976, no writ), summarizes the rules regarding the sufficiency of the evidence in workmen's compensation cases in this state. That case, citing many others, reiterates the time-honored rules pertaining to jury verdicts in such cases. The Texarkana court of civil appeals wrote:

"*It is recognized that the duration and extent of incapacity is at best an estimate which must be made by the jury from all the pertinent facts before it. . . . Where it can reasonably be inferred from the evidence that the claimant's injuries are permanent and that they totally disable him from performing the usual tasks of a workman in such a way as prohibits him from procuring and retaining employment, a verdict of total permanent incapacity will be affirmed. . . .*"
*Id.* at 693. (Emphasis added.)

■ No medical evidence is needed to support a total and permanent jury verdict in workmen's compensation cases. *Travelers Insurance Company v. Wade,* 373 S.W.2d 881 (Tex.Civ.App.—Dallas 1963, writ ref'd n. r. e.). However, the record in this case contains a great deal of medical evidence to support the total and permanent jury verdict.

■ We overrule the "insufficient evidence" point of error.

By way of cross point, Thornton moves this court to assess an additional ten percent damages against the insurance carrier for a frivolous, delay-only appeal, pursuant to Rules 435 and 438, Tex.R.Civ.P. These two rules can be dangerous for an appellee to invoke, because such a request for damages opens up the entire record and requires a reversal of the judgment for any material error, whether assigned or not. *Grimes v. Robitaille,* 288 S.W.2d 211, 213

(Tex.Civ.App.—Galveston 1956, writ ref'd n. r. e.); *Stanford v. Chambliss,* 135 S.W.2d 748, 749 (Tex.Civ.App.—Waco 1940, no writ); *Texas State Life Insurance Co. v. Aparicio,* 129 S.W.2d 794 (Tex.Civ.App.—San Antonio 1939, no writ); *Wallace v. Renfroe,* 124 S.W.2d 456, 458 (Tex.Civ.App.—El Paso 1939, writ dism'd jdgmt cor.); 4 Tex.Jur.2d Rev. Part 2, App. & Err.—Civil Cases § 890 at 547–48 (1974).

Thornton argues that the insurance carrier's appeal in this case was taken to force him to settle his case in order to avoid the delay of an appeal and to prejudice him economically.

Since even the testimony of the doctors called by the insurance carrier support the jury's findings of permanency, we agree with Thornton that this appeal was not taken in good faith and was only taken for the purposes of delay.

■ In this case, the injured worker has been delayed in the receipt of his workmen's compensation payments. Rules 435 and 438, Tex.R.Civ.P. gives this court the authority to impose these additional damages. The imposition of damages under Rule 435 is discretionary with the court of civil appeals, but under Rule 438, the imposition of such damages is mandatory when the court finds that the appeal was taken for delay and without sufficient cause. *Grimes v. Robitaille, supra,* at 213.

*Charter Oak Fire Insurance Company v. Adams,* 488 S.W.2d 548 (Tex.Civ.App.—Dallas 1972, writ ref'd n. r. e.) and *Texas Employers' Insurance Association v. Dempsey,* 508 S.W.2d 858 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n. r. e.) are two cases where courts of civil appeals have assessed the penalty in question.

■ In *Texas Employers' Insurance Association v. Dempsey, supra,* the court was of the opinion that the statutory interest did not fairly compensate the claimant for the delay caused by the appeal in that case. We are of the same opinion in the case before us.

In *Charter Oak Fire Insurance Company v. Adams, supra,* Justice Guittard of the Dallas court of civil appeals wrote:

"[W]e conclude that when the only questions raised on an unsuccessful appeal are well settled and the appellee's circumstances are such that statutory interest on the judgment is not adequate compensation for the delay, we have discretion under rule 435 to assess such damages even in the absence of a finding under rule 438 that the appeal was taken for delay. In this case, if rule 438 does not require us to assess damages for delay, we now exercise our discretion to do so under rule 435." *Id.* at 551.

■ We adopt the quoted portion above as reflecting our holding in the case at bar.

The judgment of the trial court is affirmed, with a grant of further damages for delay in the amount of $2,379.60.